# RECORD NO. 15-1064

### In The

# United States Court Of Appeals

## For The Fourth Circuit

## KENNETH BEVINS; VICTORIA BEVINS,

*Plaintiffs – Appellants,*

v.

## APOGEE COAL COMPANY, LLC,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

————————————

## BRIEF OF APPELLANTS

————————————

**Cynthia M. Ranson
J. Michael Ranson
RANSON LAW OFFICES, PLLC
1562 Kanawha Boulevard, East
P. O. Box 3589
Charleston, WV  25336
(304) 345-1990**

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____      _____
(signature)                              (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF SUBJECT MATTER
   AND APPELLATE JURISDICTION ..........................................1

STATEMENT OF THE ISSUES..................................................1

STATEMENT OF THE CASE..................................................2

   Statement of Facts.................................................4

      a.    Catastrophic Failure of Truck #308 ...........................4

      b.    Randall Adams (Hobet 685E Komatsu Truck)........................9

      c.    Knowledge of Unsafe Working Condition 3 days before
            Bevins Incident ..........................................11

      d.    Apogee Written Mine Safety Program .....................12

      e.    Unsafe Work Condition that was a Violation of Well-
            Known Safety Standard within the Business of the
            Employer ................................................14

      f.    Relevant Events of October 8, 2012 – Day Bevins was
            Disabled ................................................15

      g.    Procedural   Facts   Related   to   30(b)(6)   Witness
            Deposition ..............................................18

SUMMARY OF THE ARGUMENT ...........................................22

ARGUMENT ...................................................................................... 24

    Standard of Review .................................................................... 24

    Discussion of the Issues ............................................................ 25

        District Court erred in denying the Appellants the opportunity to conduct warranted discovery ordered by the Magistrate Judge of a 30(b)(6) Apogee Corporate Representative prior to granting summary judgment ......................................................................... 25

        Notwithstanding the foregoing, Bevins Presented Sufficient Evidence to make a prima facie showing of a Specific a Violation of a Federal Regulation and a Well-Known Safety Standard within the Business of the Employer .................................. 31

CONCLUSION ................................................................................... 46

REQUEST FOR ARGUMENT .......................................................... 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................23, 31

*Belk, Inc. v. Meyer Corp., U.S.*,
   679 F.3d 146 (4th Cir. 2012) ....................................................24, 27

*Doe v. Abington Friends Sch.*,
   480 F.2d 252 (3d Cir. 2007) ...........................................................27

*Evans v. Tech. Applications & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996) ............................................................26

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v.
Mayor & City Council of Balt.*,
   683 F.3d 539 (4th Cir. 2012) ......................................................3, 22

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v.
Mayor & City Council*,
   721 F.3d 264 (4th Cir. 2013) ..........................................................26

*Greene v. Carolina Freight Carriers*,
   663 F. Supp. 112 (S. D. W. Va. 1987) ...........................29, 44, 45

*Jacobs v. N.C. Admin. Office of the Courts*
   (No. 13-2212 4th Cir. 3/12/15) .......................................................30

*Kubicko v. Ogden Logistics Servs.*,
   181 F.3d 544 (4th Cir. 1999) ..........................................................30

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) ..........................................................30

*McComas v. ACF Industries, LLC*,
   750 S.E.2d 235 (WV 2013) ......................................................43, 44

*Nader v. Blair*,
 549 F.3d 953 (4th Cir. 2008) ........................................................27

*Ryan v. Clonch Industries, Inc.*,
 219 W. Va. 664, 639 S.E.2d 756 (2006) ...............................40, 41

*TFWS, Inc. v. Schaefer*,
 325 F.2d 234 (4th Cir. 2003) ........................................................30

*T-Mobile Ne. LLC v. City Council of Newport*,
 674 F.3d 380 (4th Cir. 2012) ........................................................24

*Tolan v. Cotton*,
 572 U.S. ____ (Docket # 13-551 5/5/14) ..............................23, 31

**Statutes:**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1332 ...............................................................................1

28 U.S.C. § 1441(a) ..........................................................................1

28 U.S.C. § 1446 ...............................................................................1

30 U.S.C. § 813(j) .........................................................................2, 16

30 U.S.C. § 813(k) ........................................................................2, 16

W. Va. Code § 23-4-2(d)(2)(ii) ....................................................2, 25

W. Va. Code § 23-4-2(d)(2)(ii)(A) .............................................25, 26

W. Va. Code § 23-4-2(d)(2)(ii)(B) .............................................25, 26

W. Va. Code § 23-4-2(d)(2)(ii)(C) ............................................*passim*

W. Va. Code § 23-4-2(d)(2)(ii)(D) ..................................................26

W. Va. Code § 23-4-2(d)(2)(ii)(E) ...................................................26

**Regulations:**

29 C.F.R. § 1910.132(d)(1) ................................................................. 40, 41, 42

30 C.F.R. § 56.14100 ............................................................. 12, 13, 40, 42

30 C.F.R. § 56.14100(a) ............................................................................ 12

30 C.F.R. § 56.14100(b) ............................................................. 12, 29, 42-43

30 C.F.R. § 56.14100(c) ..................................................................... *passim*

30 C.F.R. § 56.14100(d) ............................................................................ 29

30 C.F.R. § 77.404 ....................................................................... 12, 13, 36

30 C.F.R § 77.404(a) ............................................................... 35, 36, 37

30 C.F.R. § 77.1606 ................................................................................... 37

30 C.F.R. § 77.1606(a) ............................................................................... 37

30 C.F.R. § 77.1606(b) ............................................................................... 37

30 C.F.R. § 77.1606(c) ............................................................................... 37

**Rules:**

Fed. R. Civ. P. 30(b)(6) ....................................................................... *passim*

Fed. R. Civ. P. 56(c) ................................................................................... 4

Fed. R. Civ. P. 56(c)(1) ............................................................................. 27

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The underlying cause of action was initiated in the Circuit Court of Kanawha County, West Virginia by Kenneth Bevins and Victoria Bevins. Apogee Coal Company, LLC ("Apogee") filed a Notice of Removal pursuant to 28 U.S.C. 1332, 1441(a) and 1446 (JA 15). Jurisdiction was based upon complete diversity of the parties and an amount in controversy exceeding $75,000.00. Appellate jurisdiction is based upon the district court granting summary judgment to Apogee which was a final decision. The Order granting Summary Judgment was entered on December 17, 2014 (JA 2444) and the Judgment Order was entered on December 18, 2014. (JA 2461) The Notice of Appeal was filed on January 6, 2015. (JA 2462) Courts of appeal have jurisdiction from all final decisions of the district courts of the United States. **28 U.S.C. 1291**

## STATEMENT OF THE ISSUES

The District Court erred in denying the Appellants the opportunity to conduct warranted discovery ordered by the Magistrate Judge of a 30(b)(6) Apogee Corporate Representative prior to granting summary judgment.

The District Court neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the non-moving party, and instead repeatedly drew inferences contrary to the evidence and misapplied the summary judgment standard when concluding that the plaintiffs failed to "make a prima facie showing of dispute" on *Subpart (C)* of West Virginia Code 23-4-2(d)(2)(ii).

1

## STATEMENT OF THE CASE

This suit was filed pursuant to **West Virginia Code 23-4-2(d)(2)(ii)** a/k/a the deliberate exposure statute and arises out a work related injury that occurred on October 8, 2012. The district court errors will be broken down into two categories. **First**, the district court's abuse of discretion in deciding and granting summary judgment without giving Bevins the opportunity to conduct Magistrate Judge ordered discovery including a critical and aggressively sought 30(b)(6) Witness Deposition of an Apogee Corporate Representative. The 30(b)(6) Witness Deposition would have given support for key factual propositions related to *Subpart (C)* **West Virginia Code 23-4-2(d)(2)(ii)**. Distinctly, Apogee's specific knowledge of an extremely hazardous mechanical problem with Truck #308 that existed for some time prior to the Bevins incident and Apogee's failure to repair the problem or "down" the truck before placing it back in service with Kenneth Bevins in the operators seat. The 30(b)(6) deposition would have solidified the evidence of Apogee's tampering with and destroying the critical component at issue in violation of sections 103(j) and a 103(k) *of the Federal Mine Safety and Health Act of 1977*. (JA 926)

Moreover, the development of this evidence would, at a minimum, show a genuine issue of material fact as to *Subpart (C)* of **West Virginia Code 23-4-2(d)(2)(ii)** and prohibit the district court's grant of summary judgment. The parties

2

<u>must</u> be given a reasonable opportunity to present all the material that is pertinent to a dispositive motion. The controlling authority was ignored by the district court when it denied Bevins the right to conduct Magistrate Judge ordered discovery. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539 (4th Cir. 2012)

**Second**, in denying Bevins the right to conduct the 30(b)(6) deposition the district court improperly characterized Bevins' inability to meet *Subpart (C)* of **West Virginia Code 23-4-2(d)(2)(ii)**. In granting summary judgment, the district court did not explain or find that the outstanding 30(b)(6) Apogee Corporate Representative Witness deposition was unnecessary. Moreover, the district court did not acknowledge or even address the Ron D. Adkins Affidavit which unequivocally defines Apogee's actual knowledge of a specific mechanical problem with Truck #308 that was unrepaired, prior to directing Bevins to operate it.

Importantly, the district court did not address or find that even with specific knowledge of a specific mechanical problem that Apogee has no obligation to repair the problem before placing the vehicle back in service. Instead, the district court assumed for purposes of its analysis that because the safety standard, requiring known defects be corrected before the equipment is put back into service, does not specifically identify "overextending hydraulic cylinders and free falling beds" as a "defect" that the requisite federal safety regulation and the Apogee business

3

standard cited by Bevins was "general" and inadequate. The district court determined that Apogee had "no general duty to inspect," find or fix a defect. However, this was never Bevins claim. Instead, Bevins' claim is based on the duty Apogee has to fix a known defect that can cause serious injury to an employee. Finally, the district court also criticized the record as lacking factual support of a violation of a specific state or federal statute, rule or regulation or industry standard that related to "overextending hydraulic cylinders and a freefalling truck bed". (JA 2449-2450) while at the same time denied Bevins a full opportunity to conduct discovery and present a proper record on that specific issue. This was error as the district court neglected to draw all reasonable inferences in favor of Bevins, the non-moving party. **Federal Rule of Civil Procedure 56(c)**

**Statement of Facts**

    a.    **Catastrophic Failure of Truck #308**

Appellant, Kenneth Bevins, age 59, was employed as a rock truck driver for the Appellee, Apogee Coal Company, LLC[1] ("Apogee"). On the day of the incident, Mr. Bevins was operating a Komatsu 685E truck (JA 1777), known as Truck #308, and was loading and dumping material. The bed on the Komatsu 685E truck is raised and lowered by dual hydraulic cylinders. Soon after Mr. Bevins began loading and dumping, the hydraulic cylinders overextended and

_____
[1] Patriot Coal Company is the parent of Apogee Coal Company, LLC and its sister mine, Hobet Mine, LLC.

experienced a catastrophic failure (JA 1446) causing the bed to free fall and slam onto the frame. The impact caused the left steering accumulator to separate from its bracket and fracture the hydraulic fitting on the bottom of the accumulator. (JA 1450) The resulting spray of high pressure hydraulic oil ignited on the hot turbocharger, which erupted into a huge fireball, enveloping the truck cab where Kenneth Bevins was seated. (JA 1456, 1457 and 1458)

With the source of the flames on the right side of the cab, Bevins had no safe path to reach the exit ladder. The impact from the truck bed slamming down on the frame blew out the windshield and blocked his exit. (JA 1453) Bevins slid under the left catwalk chain and jumped 11 and ½ feet to the ground. (JA 1781-1783) Mr. Bevins sustained severe and permanent injuries to his left foot, leg and ankle and permanent nerve damage to his shoulder. In addition to the permanent physical injuries, Bevins has since been diagnosed with Post Traumatic Stress Syndrome. After working 41 years in the coal industry, Bevins is now totally disabled. (JA 2089)

The dump bed of a Komatsu 685E is controlled by two hydraulic cylinders. When raising the bed, it is critical that the cylinders not extend past maximum limit. If the cylinders overextend, then tremendous pressure is placed on the cylinder retainer plate. If the cylinders fail and separate, the truck bed will slam down onto the frame with tremendous force. (JA 2066)

Originally, Komatsu sold the 685E Trucks with a 6 bolt pattern cylinder retainer and end plate. (JA 955-956) In order to prevent overextension and extraordinary pressure on the end plate, Komatsu installed an electro-magnetic limit switch with a magnet to detect movement. (JA 1963) When the dump bed or movement passes the electromagnetic limit switch, a signal is sent to the hydraulic cylinders to cut off the flow of oil.  When the flow of oil is stopped, the cylinders cannot extend. (JA 1793)  If the flow of oil is not stopped by the limit switch signal then the cylinders overextend. The installation, use and maintenance of the limit switch are critical to prevent overextension of the hydraulic cylinders. Multiple overextensions over time will fatigue the bolts on the cylinder retainer end plate. (JA 1472 and 1473) When a fatigued retainer end fails the truck bed will free fall and slam on to the truck frame. (JA 2066)

For reasons that have not been adequately explained, Apogee replaced the original equipment Komatsu electro-magnetic limit switch with an after-market mechanical limit switch. (JA 1432)  Apogee then altered the design of the truck by welding a metal plate onto the bed hoping the arm of the mechanical switch would strike the plate (JA 1441) and send a signal to stop the flow of oil to the cylinders. The original equipment electro-magnetic limit switch relies on a magnet to detect movement.  The aftermarket mechanical limit switch relies on an extended metal arm with a small wheel to strike a metal plate to detect movement. (JA 1793) The

6

replacement of an original equipment (OEM) electromagnetic limit switch with an aftermarket mechanical limit switch is prohibited by the Komatsu Maintenance Manual. (JA 1971)

Regardless of type, the goal of a limit switch is to prevent overextension of the hydraulic cylinders.   The aftermarket mechanical limit switch requires significantly more maintenance because the extended metal arm is exposed to brutal environmental forces, including being struck by large rocks.  The metal arm bends easily and is extremely vulnerable to misalignment resulting in failure to make contact with the strike plate.  If contact with the strike plate does not occur, the flow of oil does not stop and the hydraulic cylinders overextend. (JA 1793) The repeated over extension of the cylinders leads to catastrophic failure. However, and regardless of type used, a limit switch must be maintained in good working order to prevent overextension of the cylinders.

Apogee began to experience problems maintaining the limit switches in 2007, in particular the mechanical type.  Reports of unexpected and sudden bed dropping were numerous and well known by Management, Drivers and Mechanics.[2]  According to Roger Horton, Chairman of the Local Union Safety

---

[2] *Roger Horton* (JA 1904); *Agie Bryant* (JA 1909); *Robert Greer (2)* (JA 1914); *Paul Eubanks Report*, (JA 1902); *James Miller, Supervisor* (JA 1923); *Randall Parsons*, (JA 1925,1926,1928); *Roger Thompson Injury Report*, (JA 1861); *David Murphy Injury Report* (JA 1863); *Ron D. Adkins* (JA 2067); *Cletis Ellis (JA 2078)*; *Rodney Craddock* (JA 2084); *Rex Brasher* (JA 1932); *Kenneth Bevins* (JA 1939)

Committee, written injury reports were completed and counter signed by Managing Supervisors. Apogee drivers reported significant problems with the "dropping of the bed or free falling" on Truck 308.

A notable catastrophic bed failure occurred on February 14, 2008, while Roger Thompson was operating Truck #308. (JA 1861)   Thompson was rendered permanently disabled. This incident is particularly notable because it resulted in the initiation of civil litigation styled ***Thompson v. Apogee, #09-C-1916***, Circuit Court of Kanawha County, West Virginia.   During the Thompson litigation, Apogee was undeniably placed on notice that the hydraulic cylinders on Truck #308 were overextending. Expert report and testimony produced in that case specifically outlined the necessity of inspection and maintenance of the limit switch and the hazards to operators with the failure to do so.

Plaintiffs' Expert in the Thompson case, Robert Reed issued a report on June 28, 2011[3].  Mr. Reed explained in great detail the problem with failure to inspect and maintain the limit switch on Truck #308.  Reed rendered a similar opinion in this case.[4]  Because of the number of failures uncovered in *Thompson*, where operators either complained about or were injured by a free falling bed, Apogee conceded actual knowledge of the unsafe work condition. In particular,

---

[3] *Robert Reed Report*, dated June 28, 2011, (JA 1943)

[4] *Robert Reed Report*, dated September 4, 2014 (JA 1791)

Maintenance Foreman, Randall Parsons stated "it is all over the job. Everybody knows about it".[5] Apogee also admitted awareness of two similar instances at its sister mine, Hobet where drivers were seriously injured as the result a free falling bed on a 685E truck. Both instances occurred before Bevins was injured.[6]

### b.   Randall Adams (Hobet 685E Komatsu Truck)[7]

On April 24, 2011, Randall Adams[8] was seriously injured when a 685E truck bed dropped and freefell onto the frame. This catastrophic failure caused the *United States Mine Safety and Health Administration* to investigate and then issue a **Safety Alert**[9]. As part of its investigation, MSHA found that the lift cylinders on the Komatsu 685-E truck dump beds were going to full extension due to a *failure of an up limit solenoid switch* intended to stop the lift at the proper extension. According to inter-department communication notes, "this has now occurred on two of the Komatsu trucks, about a year apart".[10] Because "this condition is exposing 685 truck drivers to an extreme hazard", a **Hazard Warning** was

---

[5] *Randall Parsons* in Thompson and Bevins at 36 (JA 1925, 1926, 1928)

[6] *Tony Richardson in April, 2010* and *Randall Adams in April 2011* (JA 2050 and 2052)

[7] Komatsu Accident Notice 4/24/11 (JA 2052)

[8] Statement of *Randall Adams* (JA 2053)

[9] MSHA Safety Alert, (JA 1773)

[10] FOIA Response, *MSHA Comm.* from Approval and Certification Center with Hazard Warning (JA 2065)

prepared to raise awareness and prevent future injuries.[11] The **Hazard Warning** disclosed **two previous occasions** where Hobet drivers were exposed to severe impact and taken to the hospital. The **Hazard Warning mandated** "All Mine Locations Should Be Made Aware of This Hazard to Prevent Future Injuries." Hobet's Maintenance and Safety Managers were involved in the investigation and shared the information with Apogee Management. *Communication Meeting* notes of April of 2011 memorialize <u>Hobet and Apogee</u> <u>Joint Meetings</u> wherein limit switch and cylinder failures resulting in truck beds freefalling back onto the frame with great force were discussed. Benny Dixon, Apogee Maintenance Manager confirmed the joint meetings and his awareness of cylinder failures and free falling beds, prior to Bevins.[12]

Apogee Management does not deny it had specific and actual knowledge of the **MSHA Safety Alert,** which undeniably referenced <u>its</u> trucks, <u>its</u> limit switches and the absolute need to replace the 6 bolt pattern retainer with a 12 bolt pattern retainer on all Komatsu 685E trucks. It is undisputed that Apogee made an intentional and conscious decision not to replace the 6 bolt pattern retainer on Truck #308[13]. It is also undisputed that the **MSHA Safety Alert** did not result in

---

[11] *Hazard Warning* (JA 2066)

[12] *Apogee Meeting Notes*, (JA 2073); Chris Ellis (JA 1889); Benny Dixon (JA 1953)

[13] Photo 6 bolt pattern on Truck 308, *Rob Hall, Komatsu Accident Notice* (JA 1448)

Apogee taking any steps to improve the maintenance of the limit switches. Finally, it is undisputed that even though the Komatsu Maintenance Manual requires Apogee to check the limit switches after every 10 hours of operation to assure the proper operation, and Apogee was aware of the requirement, (JA 1973 and 1974) Apogee intentionally ignored the Komatsu maintenance mandate and instead checked the switches after every 350 hours of operation. (JA 369)

### c. Knowledge of Unsafe Working Condition 3 days before Bevins Incident

Deposition testimony indicates that three days before Bevins was injured, Ron D. Adkins was ordered to operate Truck 308 because his regular truck was out of service. After Truck 308 was loaded with the first load, Adkins went to dump it and after raising the bed, the bed "bucked" as he was dumping. The bed then free fell about ¾'s of the way down and caught itself. Adkins immediately realized that the "truck is not fixed". He told supervisor, Nickey Johnston, the bed was dropping and was told to take the truck to the maintenance yard and park it[14].

Adkins parked the truck as directed and advised Randall Parsons, Maintenance Foreman of the freefalling bed. Parsons told Adkins the bed was bucking and dropping because the limit switch was not working properly[15]. Three

---

[14] *Glen Hurley*, Production Supervisor, recalls Supervisor, *Nickey Johnston* telling him about Adkins 308 bed dropping *Hurley* (JA 1847)

[15] *Ron D. Adkins Affidavit*, (JA 1959)

days later, Truck #308 was assigned to Bevins even though it was not inspected or repaired. Apogee has <u>produced no records</u> documenting any maintenance or inspection performed on Truck 308 <u>after</u> Adkins' reported the bed dropping and <u>before</u> it was assigned to Bevins.

### d.    Apogee Written Mine Safety Program

Importantly, Apogee has its very own written Mine Safety Program standard **<u>mandating</u>** the downing of mobile equipment when an employee reports a known mechanical problem. (JA 1975) The specific mandate requires equipment with a reported mechanical problem to be downed and not operated until the reported problem is fixed. The Apogee written business standard is consistent with *30 CFR 56.14100*[16] and *30 CFR 77.404* which also require downing and tagging out of any piece of mobile equipment with a known mechanical problem. Placing equipment

---

[16] **§ 56.14100 Safety defects; examination, correction and records.**

> **(a)** Self-propelled mobile equipment to be used during a shift shall be inspected by the equipment operator before being placed in operation on that shift.
> **(b)** Defects on any equipment, machinery, and tools that affect safety shall be corrected in a timely manner to prevent the creation of a hazard to persons.
> **(c)** When defects make continued operation hazardous to persons, the defective items including self-propelled mobile equipment shall be taken out of service and placed in a designated area posted for that purpose, or a tag or other effective method of marking the defective items shall be used to prohibit further use until the defects are corrected.
> **(d)** Defects on self-propelled mobile equipment affecting safety, which are not corrected immediately, shall be reported to and recorded by the mine operator. The records shall be kept at the mine or nearest mine office from the date the defects are recorded, until the defects are corrected. Such records shall be made available for inspection by an authorized representative of the Secretary.

12

back into service before the problem is repaired is strictly prohibited. It is clear that Apogee was aware and understood the federal safety standards found in *30 CFR 56.14100* and *30 CFR 77.404* as these standards are virtually identical to Apogee's own written business standard.

Despite the specific complaint by Ron D. Adkins that a mechanical problem existed with Truck #308, Apogee took no direct action to correct the unsafe working condition. The Truck was not inspected, downed or tagged out. Instead, Apogee put Truck #308 back in service and assigned it to Kenneth Bevins. Since the hydraulic cylinders were in a known state of disrepair and impending failure, the expected occurred. While Bevins was dumping material, the dual cylinders on the dump bed extended beyond capacity. The 6 bolt pattern retainer plate could not withstand any more stress and when the truck bed was at full dumping height the cylinders separated. The truck bed fell freely and violently onto the frame and the truck erupted into flames.

The only post-incident photograph taken of the limit switch reveals a *mechanical* limit switch with a severely bent arm. (JA 1975) This seems to explain why the limit switch arm was no longer making contact with the aftermarket strike plate and why the cylinders overextended and ripped apart.[17] This issue would

---

[17] *WVOMSH&T* Photo by Inspector *Gore* (JA 1785) *Mechanic Workman* (JA 1785 and1786) and *Robert Reed Report (2014)* at (JA 1794 and 1799)

have been specifically addressed in the Apogee 30(b)(6) Witness deposition, had it occurred[18].

It is clear that if, after Ron D. Adkins reported the mechanical problem with Truck #308, Apogee would have simply followed its own written safety standard and downed, inspected and repaired Truck #308, Bevins would not be disabled. Inexplicably, Apogee ignored its own internal written policies and procedures as well as a well-established federal safety standard and returned Truck #308 to service without inspection or repair. Then, just like many other drivers before him, Bevins was knowingly put at risk and his 41 year career was ended.

### e.     Unsafe Work Condition that was a Violation of Well-Known Safety Standard within the Business of the Employer

The district court analysis completely ignored Apogee's own written safety standard which states "a piece of mobile equipment is to be taken out of service for an unsafe operating condition."(JA 1975)  This standard is virtually identical to *30 CFR § 56.14100(c)* which states, in pertinent part, "self-propelled mobile equipment shall be taken out of service and placed in a designated area posted for that purpose, or a tag . . .shall be used to prohibit further use until the defects are

---

[18] The first person from Management that appeared on the scene after Bevins was injured testified that the mechanical limit switch was missing its arm. (JA 2224 and 2225) However, by the time Mine Inspectors appeared on the scene the arm had been magically reattached to the limit switch. It is believe that the 30(b)(6) Deposition would confirm that the magically reattached arm was simply bolted to the switch ad was not working.

14

corrected". According to Apogee, "it was the production crew's <u>standard practice</u> that if any employee had an issue with any piece of equipment that it was to be downed and checked by maintenance. If a piece of equipment was downed, maintenance would <u>never release it</u> until it was properly working." (JA 1849) There is no dispute that a mechanical problem existed with Truck #308 when Ron D. Adkins parked it in the maintenance yard. There is a complete absence of evidence the truck was fixed or even inspected before being assigned to Bevins. The district court failed to credit this evidence that contradicted its key conclusion.

### f.    **Relevant Events of October 8, 2012 – Day Bevins was Disabled**

On the day he was injured, Bevins was working an extra shift. His regular truck, 730 Series Komatsu #702, was being driven by another operator. Bevins was instead assigned to Truck #308, which was known as the **"joke" truck or the "birthday" truck**. According to Production Superintendent, Glen Hurley, Truck 308 was not assigned to any one in particular because Truck 308 was "made a joke". Hurley confirmed the operators would complain that they were being "punished" if they were put in Truck 308 because "when something happened, it was always 308". Pit Supervisor, Nickey Johnson referred to Truck #308 as the "Birthday Truck" because of "all the incidents that have happened with it over the years, including the <u>Roger Thompson</u> incident". (JA 1850-51 and JA 1854)

Although Bevins did not complain about being assigned to Truck #308, when he got into the truck, the lights would not come on and the truck would not move forward or backward. Bevins immediately notified his foreman, Nickey Johnston, who instructed him to stay with Truck 308 and wait for maintenance. An electrician eventually came to Bevins and "got it moving". (JA 1780)  The electrician did not identify the problem to Bevins.  Once Truck 308 was drivable, Bevins began to haul and "back-stack" dry shale and rocks.  Back-stacking is when the operator dumps the load directly on the ground as opposed to over a berm. Bevins hauled approximately eight loads when he experienced a catastrophic failure resulting in the bed slamming down on the frame of the truck and then erupting in a ball of fire. There were no eye-witnesses and there is no evidence of driver error[19].

After the incident, Apogee failed to preserve the truck and its critical component, the bed limit switch. In violation of a 103(j) order and a 103(k) order[20], Chris Ellis, Maintenance Superintendent, and others at his direction, seemingly tampered with the bed limit switch. The bed limit switch was removed and broken apart so as to destroy its true condition post accident. (JA 926) Ellis espoused

---

[19] *Hurley* at (JA 1852) *Johnston* at (JA 1856-1857); *Hicks* at (JA 1868)*Komatsu Operators Manual* at HB 6-8 (JA 1972)

[20] *Timeline of 103(j) and 103(k) Orders* (JA 1872*); 103(j) Order (JA 1875), 103(k) Orders* (JA 1876-1878)

16

ignorance about the identity of the person who actually removed and broke the limit switch.[21] The Apogee 30(b)(6) Notice of Deposition required the production of the person or persons who removed the limit switch, in violation of federal law, as well as the person or persons who broke the limit switch. (JA 52) Bevins was denied the opportunity to conduct this crucial deposition. This deposition would have shown that the limit switch was indeed in disrepair prior to Bevins driving Truck#308. This evidence would be the specific defect that Maintenance Foreman, Parsons told Ron D. Adkins was causing the bed to drop and the specific defect that required repair pursuant to specific federal safety regulations and specific written Apogee standards.

As noted, the photograph taken by West Virginia State Mine Inspector Lonnie Gore, (JA 1785) the morning after the incident shows an intact bed limit switch hanging upside down from a yellow cable with a <u>severely bent arm</u>. The photograph also shows that the arm is not properly mounted on the limit switch. Two photographs taken by Robert Hall, Komatsu accident investigator, a few hours later shows the <u>bed limit switch missing from Truck #308</u>. (JA 1440 and 1442) No one has admitted to removing the limit switch. After litigation ensued, Bevins' counsel was presented with a limit switch in a condition that was inconsistent with the photographic evidence gathered by the Mine Inspector. The

---

[21] *Christopher Ellis* at (JA 1894) and *Tony Bowens* at (JA 1897 and 1898)

"litigation" limit switch was <u>broken into pieces</u>. The broken and clearly altered limit switch was purportedly on Truck #308 when Bevins was injured (JA 1901). It is Bevins' contention that the limit switch was broken apart to conceal the fact that the arm had been improperly mounted on the switch and was therefore inoperable prior to the bed falling on Bevins. This would also explain why the bed fell on Ron D. Adkins. These facts would have been discovered had Bevins been permitted to complete discovery.

### g.    Procedural Facts Related to 30(b)(6) Witness Deposition

The Amended Scheduling Order entered on August 15, 2014 directed "all depositions to be completed by 9/15/14 and dispositive motions filed by 9/26/14". (JA 49)   Bevins filed a timely <u>Notice to Take Deposition of Rule 30(b)(6) Corporate Representative of Apogee</u> on September 8, 2014. The deposition was set for September 15, 2014. (JA 52)  Apogee did not file an objection to the Notice to Take Deposition of Rule 30(b)(6) Witness but failed to appear or produce a witness. Thereafter, Bevins filed a <u>Motion to Compel the Rule 30(b)(6) Witness</u> on September 26, 2014 (JA 886) along with a Motion for Sanctions for Spoliation of Evidence and Memorandum in Support. (JA 926)  Apogee then filed a Motion for Summary Judgment on September 26, 2014. (JA 59)  Bevins' Motion to Compel the Apogee 30(b)(6) Deposition was referred to Magistrate Judge Dwane Tinsley on September 29, 2014.

18

In compliance with the Amended Scheduling Order, Bevins filed a Memorandum in Opposition to Apogee's Motion for Summary Judgment on October 10, 2014. (JA 1753) On Pages 1 and 8 of the Memorandum, Bevins denoted that his Motion to Compel the 30(b)(6) Witness Deposition and Motion for Sanctions for Spoliation of Evidence were pending before Magistrate Tinsley (JA 1753 and 1760) The Amended Scheduling Order set the Motion for Summary Judgment hearing on October 22, 2014.  By *sua sponte* Order dated October 16, 2014; the hearing on Motion for Summary Judgment was cancelled. In compliance with the Amended Scheduling Order and in anticipate of trial, the parties filed various motions in limine and responses thereto as well as a Joint Proposed Pre-Trial Order.  The Pre-Trial Conference set for November 12, 2014 was then "reset" *sua sponte* for November 24, 2014. (JA 2325)

On November 3, 2014, Apogee filed a motion to postpone the Pre-Trial Conference set for November 24, 2014 declaring a scheduling conflict. (JA 2326) By Order dated November 5, 2014, the district court granted the Motion to Postpone and reset the Pre-trial Conference to January 20, 2015.  The Court's Order also moved and reset the Trial date to February 3, 2015. (JA 2332)

Then, by Order dated November 21, 2014, Magistrate Judge Tinsley **granted** the Plaintiffs' Motion to Compel the 30(b)(6) Witness Deposition. (JA 2334) An *Amended Notice to Take the Rule 30(b)(6) Deposition* was filed on

19

November 25, 2014 noticing the deposition for December 4, 2014. (JA 2340) Incredibly, however, Apogee and its legal counsel **again** failed to appear or produce a 30(b)(6) witness and filed no objection thereto. On December 5, 2014, Plaintiffs filed a <u>Motion for Sanctions for Apogee's Failure to Obey the Court's Order Directing the Production of a Rule 30(b)(6) Witness</u> (JA 2347). The Defendants responded to the Motion for Sanctions (JA 2417) and the matter was once again referred to Magistrate Judge Tinsley.

Thereafter and by agreement, Bevins once again noticed the 30(b)(6) Witness deposition for December 18, 2014 and a *Second Amended Notice to Take Deposition of Rule 30(b)(6) Deposition* was filed. (JA 2420) Magistrate Judge Tinsley then denied, as moot, the *Plaintiffs' Motion for Sanctions for Apogees' Failure to Produce the 30(b)(6) Witness for Deposition*. (JA 2435)

Disturbingly, and without regard to the crucial and outstanding Court Ordered 30(b)(6) Witness Deposition scheduled to occur on December 18, 2014, the district court granted Apogee Summary Judgment on **December 17, 2014**. (JA 2444) Literally, ***the day before*** the long awaited 30(b)(6) deposition was to occur, Bevins was **yet again** denied the opportunity to conduct the 30(b)(6) Deposition of the Apogee Corporate representative -- this time with a fatal effect. The anticipated testimony from the 30(b)(6) Apogee Corporate Representative was buried.

20

It is important to note that Bevins was not dilatory in conducting discovery or requesting the Apogee 30(b)(6) deposition. Dating back to December 4, 2013, Bevins commenced aggressive efforts to discover the identity of the person or persons who removed, tested and destroyed any portion of the limit switch after Bevins was injured. (JA 52 and 886)  In addition to the witness identity request, the Bevins requested a complete chain of custody pertaining to the limit switch and/or the components making up the limit switch from the moment immediately following his injury up to the moment the limit switch was presented for inspection by Bevins' expert and counsel on April 2, 2014. (JA 917) Neither was provided.

Then, after deposing virtually every Apogee Management and Maintenance employee and every other person known to have worked on or come into contact with Truck #308 without discovering the identity of the person who removed and/or destroyed the switch, a *Notice to Take Rule 30(b)(6) Deposition* was filed in a timely manner. (JA 52)  As is documented herein, Bevins made more than a valiant effort to acquire the Rule 30(b)(6) deposition, even seeking and obtaining the assistance and hand of Magistrate Judge Tinsley. (JA 2334)  And, although an Order compelling the production of a 30(b)(6) witness for deposition was entered by Magistrate Judge Tinsley, Apogee again failed and refused to produce the witness.  Ultimately, Bevins was denied the opportunity to depose the 30(b)(6)

21

witness -- as his efforts were finally thwarted by the district court's order granting summary judgment, entered <u>the day before</u> the 30(b)(6) deposition was to occur. The timing of the Order granting summary judgment is baffling.

<u>**SUMMARY OF THE ARGUMENT**</u>

It is well established that the fundamental principles of fairness dictate that both parties to a proceeding are entitled to take meaningful discovery. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539 (4th Cir. 2012). Bevins could not properly oppose summary judgment without a chance to conclude the Court Ordered 30(b)(6) Witness Deposition. It is well established that the parties must be given a reasonable opportunity to present all material that is pertinent to the motion. The controlling authority was ignored entirely by the district court.

Clearly, the discovery sought by Bevins was determined warranted as Magistrate Judge Tinsley **<u>granted</u>** the Plaintiffs' Motion to Compel the 30(b)(6) Witness deposition (JA 2334). In denying Bevins the warranted discovery concerning the critical component at issue, the district court short-circuited the factual development and the analysis that was essential to properly decide the sufficiency of the *Subpart (C)* evidence. The analysis of that issue is fact-driven and mandates a full development of the facts. The Court Ordered 30(b)(6) deposition was especially important when the relevant facts were exclusively in the

22

control of Apogee, the party moving for summary judgment.  It was erroneous for the district court to draw conclusions and grant summary judgment while at the same time denying Bevins the full benefit of discovery.

Moreover, the district court failed to adhere to the fundamental principle that when ruling on a motion for summary judgment the evidence of the non-movant is to be believed and all justifiable inference are to drawn in his favor.  *Tolan v. Cotton*, 572 U.S. ____ (Docket # 13-551 5/5/14) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The district court's justification for granting summary judgment rested on an erroneous perception that Bevins did not produce sufficient evidence germane to *Subpart (C)* of the intentional exposure statute.  To establish a prima facie case in support of *Subpart (C)* of **West Virginia Code § 23-4-2(d)(2)(ii)**, Bevins must show the specific unsafe working condition in his workplace was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation, or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions. Bevins was denied the full

23

opportunity to meet the standard. However, if and when given the opportunity, Bevins will unquestionably identify the specific unsafe working condition in his workplace that was a violation of a federal safety regulation and a written standard in Apogee's own Mine Safety Program. Bevins will also confirm Apogee's actual knowledge about the unsafe condition and its violation prior to placing Bevins in Truck #308. The district court's failure to properly assess and to ignore the context of Apogee's knowledge of a violation of a federal safety standard and its own written business standard coupled with denying Bevins the opportunity to make a record proved to be ruinous and an error only this Court can correct.

## **ARGUMENT**

### **Standard of Review**

The district court' denial of discovery before ruling on summary judgment is reviewed for abuse of discretion. A court abuses its discretion when its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146 (4th Cir. 2012)

A district court's decision granting summary judgment is reviewed de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, here Kenneth and Victoria Bevins. *T-Mobile Ne. LLC v. City Council of Newport*, 674 F.3d 380 (4th Cir. 2012)

24

## Discussion of the Issues

**District Court erred in denying the Appellants the opportunity to conduct warranted discovery ordered by the Magistrate Judge of a 30(b)(6) Apogee Corporate Representative prior to granting summary judgment**

Under West Virginia law, an employers' worker's compensation immunity is stripped away when a rational trier of fact can find from the evidence that the employer deliberately exposed an employee to injury. **W. Va. Code 23-4-2(d)(2)(ii)** An employer has acted with deliberate intention if all of the following facts are proven:

(A)   That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B)   That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and strong probability of serious injury or death by the specific unsafe working condition;

(C)   That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business or the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation, or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D)   That notwithstanding the existence of the facts set forth in subgraphs (A) thorough (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(E)   That the employee exposed suffered serious compensable injury or compensable death as defined in section one, article four, chapter twenty-three whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

The employer's immunity is lost if all five statutory requisite factors are proven. The district court concluded Bevins failed to "make a prima facie showing of dispute" on statutory requisite *Subpart (C)* and granted summary judgment. *Subparts (A), (B), (D) and (E)* were not found to be lacking by the district court. Instead the district court stated "that the Plaintiffs may have a fairly good case considering only the other four factors is of no moment. The statute leaves no room for flexibility; the Legislature intended all five factors to be proven." (JA 2448)

Notwithstanding the foregoing, the parties <u>must</u> be given a reasonable opportunity to present all the material that is pertinent to the motion.   The controlling authority was ignored by the district court.   *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council*, 721 F.3d 264 (4th Cir. 2013) Summary Judgment is appropriate only after adequate time for discovery *Evans v. Tech. Applications & Serv. Co*., 80 F.3d 954 (4th Cir. 1996) In the main, discovery is essential in a contested proceeding prior to summary judgment because a party can show that the relevant facts are undisputed only by:

26

(A)    citing to particular parts of material in the record, including **<u>depositions</u>**, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials; or

(B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Federal Rule Civil Procedure 56(c)(1)* **(emphasis added)**

Hence, by its very nature, the summary judgment process presupposes the existence of an adequate record. *Doe v. Abington Friends Sch.*, 480 F.2d 252 (3d Cir. 2007) The district court, herein, poignantly stated that the record was lacking, but then refused to deny summary judgment even though the nonmoving party did not have the opportunity to discover information that was essential to his opposition.  This is a clear misapprehension of summary judgment standards. *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008)

A court abuses its discretion when "its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding. *Belk, Inc. v. Myer Corp. U.S.*, 679 F.3d 146 (4th Cir. 2012) As explained below, the district court's denying Bevins the right to discovery was patently erroneous. The district court failed to address or provide any justification whatsoever for refusing to permit Bevins to conduct the Apogee 30(b)(6) Witness deposition. In fact, the district court failed to address the 30(b)(6) Witness deposition at all.  The district court also failed to address the sworn testimony of Ron D. Adkins confirming the pre-

27

injury mechanical problem with Truck #308 <u>or</u> the admission by the Apogee Maintenance Supervisor that he knew Truck #308 had a faulty limit switch before Bevins was ordered to drive it. In this case, the district court neither undertook nor properly conducted an analysis of <u>the actual facts</u> in the record.

At the very least, Bevins should have been given the opportunity to substantiate his claim that the critical component on the truck, i.e. the limit switch, was broken or in disrepair, that Apogee had actual and specific knowledge of that broken or condition of disrepair and nevertheless deliberately exposed Kenneth Bevins to serious risk. The 30(b)(6) Witness deposition would have substantiated Bevins' claim that not only did Apogee deliberately expose him to a serious risk of injury, but that after he was exposed, Apogee removed and destroyed the crucial piece of evidence needed to support his contention. None of this was addressed by the district court.[22]

Obviously, the relevant facts related to the pre and post-incident condition of the limit switch was in the exclusive control of Apogee. Neither the district court nor this Court is able to properly assess the context of Apogee's violation of a federal safety standard and/or its own business standard or the tampering and destruction of evidence without that evidence being in the record.

---

[22] Magistrate Judge Tinsley effectively invited the refiling of the Motion for Sanctions for Spoliation of Evidence after the 30(6)(6) deposition was concluded, if the circumstantial evidence of tampering and destruction were substantiated. (JA 2435) Bevins was also denied this opportunity by the district court.

It was legally erroneous for the district court to conclude, without the benefit of the 30(b)(6) Witness deposition, that Bevins did not meet the requisites of *Subpart (C)* of the deliberate exposure statute. The district court's finding that the Bevins did not provide sufficient evidence *Subpart (C)* was premature and inappropriate. Under the applicable rules of procedure and precedent, it was essential to Bevins' opposition to the summary judgment and to a fair and proper exercise of judicial scrutiny for the district court and this Court to have the benefit of the discovery. The 30(b)(6) Witness deposition would have yielded the actual and specific knowledge and federal regulation and industry standard violated.

In preventing Bevins' right to conduct the 30(b)(6) Witness deposition, the district court improperly characterized Bevins' inability to meet the requisite *Subpart (C)* of **W. Va. Code § 23-4-2(d)(2)(ii)** by reciting and relying on the *Greene v. Carolina Freight Carriers,* 663 F. Supp. 112 (S.D. W. Va. 1987)(J. Haden) decision for the proposition that the 30 C.F.R. 56.14100(b)(c)(d) "lacks the level of specificity required under the law to withstand summary judgment". (JA 2452) Bevins, however, sought to solidly augment the record with evidence to support a specific and unequivocal violation of *Subpart C* of the deliberate exposure statute. Criticizing the record as somehow lacking merely begs the real question of "<u>Why Bevins was denied a full and fair opportunity to conclude Court Ordered discovery and present a proper record</u>?" Regardless of the answer to that

question, in the context of "specificity or lack thereof", the district court abused its discretion by denying Bevins the right to conduct the Court ordered discovery.

Similarly, the sworn testimony of Ron D. Adkins (JA 2237), Glen Hurley (JA 1848) and Randall Parsons (JA 1926, 1929, 1930) – all uncontroverted – was never referenced by the district court. And because this is an appeal from summary judgment, the declarations must be viewed in the light most favorable to Bevins. *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 511 (4th Cir. 1999) The Ron D. Adkins' Affidavit alone was more than sufficient to create a genuine issue of material fact on the violation of a specific statute, rule, regulation or industry standard requirement. *TFWS, Inc. v. Schaefer*, 325 F.2d 234, 241-42 (4th Cir. 2003), but the district court completely ignored the Adkins Affidavit. At the very least, Bevins identified a genuine dispute of material fact on the narrow issue of *Subpart (C)* with the Adkins Affidavit. Summary judgment is never appropriate where, as here, there are genuine disputes of material fact.

The district court was required to view all the facts and all justifiable inferences arising therefrom in the light most favorable to Bevins, as the nonmoving party. *Jacobs v. N.C. Admin. Office of the Courts* (No. 13-2212 4th Cir. 3/12/15) citing *Libertarian Party of Va. v. Judd*, 718 F.2d 308, 312 (4th Cir. 2013) Because the district court erred in failing to do so, the judgment should be vacated and remanded for such further proceedings as may be appropriate.

30

**Notwithstanding the foregoing, Bevins Presented Sufficient Evidence to make a prima facie showing of a Specific a Violation of a Federal Regulation and a Well-Known Safety Standard within the Business of the Employer**

It is crystal clear that the District Court failed to adhere to the fundamental principle when ruling on a motion for summary judgment that the evidence of the non-movant is to be believed and all justifiable inferences are to drawn in his favor. *Tolan v. Cotton*, 572 U.S. ____ (Docket # 13-551 5/5/14) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  The district court's justification for granting summary judgment rested on an erroneous perception that Bevins did not produce sufficient evidence germane to *Subpart (C)* of the intentional exposure statute.  To establish a prima facie case in support of *Subpart (C)* of  **West Virginia Code § 23-4-2(d)(2)(ii)**, Bevins must show the specific unsafe working condition in his workplace was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation, or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions.  Clearly, the district court failed to recognize that Apogee <u>had</u> specific knowledge of an unsafe working

31

condition, <u>knew</u> the condition created an extreme hazard for drivers and that <u>it</u> <u>violated</u> both a federal safety standard and Apogee's own written business standard. Second, the district court did not appropriately apply the federal regulation and industry standard germane to the particular work and working condition involved at Apogee.  Simply stated, the district court's analysis was not based upon the evidence produced by Bevins.   Instead, the district court completely ignored the facts in the record and based its decision on a flawed analysis.

In declining to recognize facts in the record, the district court incorrectly concluded that Bevins expected Apogee to inspect and fix all defects in the rock trucks on a daily basis. Because of this misplaced belief, the district court found that absent a standard requiring Apogee to keep a piece of equipment, specifically a "truck with overextending hydraulic cylinders and a freefalling bed" in good repair, Bevins cannot withstand summary judgment. However, and contrary to the district court's justification, Bevins never advanced a "general daily duty to repair" standard and will concede that *Subpart C* requires him to identify a specific unsafe work condition in the workplace that violates a federal safety statute and/or industry or business standard.

In order to identify the duty owed to Bevins at the time Apogee ordered him to drive Truck #308, the Court cannot ignore and <u>must</u> consider the vast and

specific knowledge Apogee had regarding the cause for "overextending hydraulic cylinders and a freefalling bed" on the Komatsu 685E trucks, including Truck #308. The evidence produced by Bevins was that Apogee began to experience difficulty maintaining the limit switches on its Komatsu 685E Trucks in 2007. Apogee had actual knowledge that proper maintenance of a limit switch is mandatory and that if, the limit switches are not maintained, then dump bed failure will occur and drivers will be seriously injured. Bevins presented a very long and documented history of dump bed failures dating back to 2007 and as recently as three days before he was injured. The failures were directly related to a failure to maintain the limit switch. As previously noted, in April of 2011, a Hobet 685E truck driver was seriously injured when a limit switch failed and resulted in an overextension of the dump bed, the bed dropped and slammed onto the frame of the truck. As a result of that incident, MSHA issued a **Safety Alert**[23] mandating the need to maintain the limit switches and to change the 6 bolt pattern end plates on the hydraulic cylinders to a 12 bolt pattern on all trucks. Importantly, the April 2011, **MSHA Safety Alert** warned of the **<u>extreme hazard to drivers,</u>** if the 6 bolt cylinder pattern was not replaced with a 12 bolt pattern. Truck #308 still had a 6 bolt cylinder pattern when Bevins was injured.

---

[23] *Benny Dixon*, Apogee Mine Manager knew about the problem as early as 2000 (JA 1953)

Once Apogee gained specific knowledge of the **MSHA Safety Alert,** which specifically related to the 685E trucks at its mine site, a slow process to replace the 6 bolt pattern cylinders to a 12 bolt pattern on the 685E trucks began, but not on all of the Trucks and not on Truck #308. (JA 1448)    Apogee intentionally decided not to change the 12 bolt pattern on Truck #308 because it was not a truck regularly assigned to any specific operator.   Truck #308 was historically used as a "spare" and had become known at Apogee as the "**Joke Truck**" because of its many mechanical failures including the sudden dropping of the bed.

Apogee does not deny that it had specific knowledge that if the limit switch failed, the hydraulic cylinders would also fail, causing the bed to suddenly drop and seriously injure the driver. This knowledge must be applied to the duty Apogee has to repair and maintain the trucks once put on specific notice that a dump bed is failing.  This is a mandatory specific requisite that cannot be ignored.

In the Memorandum Opinion, the district court ignored the crucial fact that Apogee sent Bevins out in Truck #308 despite having specific and actual knowledge that Truck #308 had overextending hydraulic cylinders and a dump bed that was free falling. The 30(b)(6) deposition would have confirmed that the cause of the overextension was the broken limit switch.  This is critical because Apogee Management informed Ron D. Adkins that he believed that a faulty limit switch was causing the bed to drop. Once this was confirmed then Apogee would have

actual knowledge of a specific defect before Bevins drove Truck #308. Apogee is required under federal safety standards as well as its own standards to fix any specific defect about which it has knowledge prior to Truck #308 being operated. It was not disputed that the failure to fix these specific know defects would result in a hazardous event and cause serious injury to the operator.

It is no surprise that Kenneth Bevins was seriously injured on October 8, 2012 because just three days before, on October 5, 2012, Ron Adkins reported that the hydraulics were overextending and the bed was freefalling. Adkins immediately notified his supervisor and took the Truck to the maintenance yard and parked it. After the Truck was parked, Apogee Maintenance Foreman, Randall Parsons admitted to Adkins that the bed was overextending and falling because there was a problem the limit switch. After the complaint by Adkins and diagnosis by Parsons, Truck #308 should have been downed until the limit switch was fixed! No federal standard or Apogee written standard permits Apogee to place Truck #308 back in service with a known defect that will injure the driver. The district court failed to acknowledge or credit this evidence and then improperly resolved the issue in favor of the moving party, Apogee.

Clearly, once Management at Apogee gained specific knowledge that the bed of Truck #308 was failing and the limit switch was not working, certain duties arose, including, but not limited to those found in **30 C.F.R § Part**

**77.404(a)**[24], a <u>mandatory</u> safety standard for Surface Coal Mine operators which requires a piece of mobile equipment to be immediately removed from service when it is in unsafe condition[25]. Additionally, **30 C.F.R. § 56.14100(c)** states:

> When defects make continued operation hazardous to persons, the defective items including <u>self-propelled mobile equipment</u> shall be taken out of service and placed in a designated area posted for that purpose, or a tag or other effective method of marking the defective items shall be used to prohibit further use until the defects are corrected.

These federal safety standards outline <u>Apogee's specific duty</u> when it gained actual knowledge that an unsafe operating condition existed in Truck #308. Apogee did not contest that it knew on October 5 that Truck #308, a piece of self-propelled mobile equipment, had a free falling bed with a defective limit switch.

---

[24] **30 CFR 77.404 - Machinery and equipment; operation and maintenance**

> **(a)** Mobile and stationary machinery and equipment shall be maintained in safe operating condition and machinery or equipment in unsafe condition shall be removed from service immediately.

[25] Contrary to the district court's findings, it was not Bevins' contention that Apogee failed to check Truck #308 before it was operated and thereby failed to find an unsafe condition. It is Bevins' contention that Apogee had absolute knowledge of the specific unsafe condition i.e. a failed limit switch and an overextending bed. Apogee does not deny this fact. Obviously, once Apogee gained specific knowledge of the unsafe condition of its mobile equipment it is under a mandatory federal safety regulation to remove the equipment from service until it is fixed. <u>It is not credible</u> to find that Apogee can have specific knowledge of a defect in a Truck and without making repairs place that Truck back into service knowing it will fail and cause injury. The district court failed to recognize Apogee's actual and specific knowledge of the defect in Truck #308 as well as Apogee's failure to fix the defect before directing Bevins to drive it.

36

Furthermore, and at that time, Apogee also had actual knowledge of a written **MSHA Safety Alert** warning Apogee that continued operation of a Komatsu 685 Truck with a defective limit switch was an <u>extreme hazard for the driver</u>.  Apogee had already lost multiple drivers to serious injuries because of free falling beds on Truck #308.  There is absolutely no doubt that Apogee knew it must fix the reported defect in Truck #308 or take it out of service.  Rather, no repair occurred, and Kenneth Bevins was seriously injured.  Then, after that, it seems that Apogee spoiled the critical component evidence, i.e. the limit switch. It is incredulous to believe that Apogee's egregious conduct received the district court's approval.

Regardless of the application of **30 C.F.R § Part 77.404(a)**, **30 C.F.R § Part 77.1606[26]** or **30 C.F.R. § 56.14100(c)**, the district court completely failed to address or even recognize Apogee's violation of its own written business industry standard.   First and foremost, Apogee has its own written standard which

---

[26] **30 CFR 77.1606 - Loading and haulage equipment; inspection and maintenance.**

> **(a)** Mobile loading and haulage equipment shall be inspected by a competent person before such equipment is placed in operation. Equipment defects affecting safety shall be recorded and reported to the mine operator.
> **(b)** Carriers on aerial tramways, including loading and unloading mechanisms, shall be inspected each shift; brakes shall be inspected daily; ropes and supports shall be inspected as recommended by the manufacturer or as physical conditions warrant. Equipment defects affecting safety shall be reported to the mine operator.
> **(c)** Equipment defects affecting safety shall be corrected before the equipment is used.

**specifically requires** a piece of equipment in an unsafe operating condition be taken out of service until it is fixed.  This specific type of standard is expressly defined in *Subpart (C)* of **W. Va. Code § 23-4-2(d)(2)(ii) which states in pertinent part:**

> "written standard in the business specifically applicable to the particular work and working condition involved**"**

***and Apogee clearly violated it***.    There is nothing "general" about this requirement and the district court obviously did not consider it at all.

> (1) A piece of equipment is to be taken out of service for the following reasons:
>     a-Defective braking systems or steering components
>     b-Defective back up alarm
>     c-No tail lights **after dark**
>     d-Defective horn or seat belts
>     e-Defective rear camera systems (trucks 230-ton and above)
>     f-Unsafe operating condition

Moreover, the following **"Red Tags"** policy can be found in the written *Apogee Comprehensive Mine Safety Program for Guyan Mine of Apogee Coal Co*mpany, LLC.

> **RED TAGS**
>
> A tag out system is in place at this mine and is available to be used by foremen, maintenance personnel ,equipment operators, and others as needed.  If a piece of equipment is suspected to be in a condition that would make it unsafe to operate, a tag is placed in a visible location to instruct that such equipment is not to be operated until checked and repaired, if necessary.

When granting Summary Judgment the district court not only ignored this relevant evidence, but it erroneously defined Bevins' claim against Apogee as being some "general duty" to check its equipment to see if a defect existed. The "Red Tags" requirement is a "statute, rule, regulation or standard that is specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions. The district court's finding of "too general" simply has no basis.

In sum, it cannot be denied that on the morning of October 8, 2012, Apogee had specific knowledge of the following with regard to Truck #308:

1.   It had a broken or inoperable limit switch;[27]

2.   It had an over-extending bed which, based upon prior instances of failure and knowledge by Apogee, is a defect that will cause the supporting bolts to fatigue and break permitting the bed to slam down on the frame and result in serious injury to the operator; and

3.   Bevins was directed to drive Truck #308, albeit with a well-known, unrepaired, and unsafe condition – all in violation of federal safety standards and Apogee's own mandatory, specific written duty to repair or red tag.

---

[27] The full extent of the condition of the limit switch would be revealed and all doubt removed if discovery was completed.

Strangely, the district court omits any mention of this evidence. Surely, a reasonable jury could infer from these facts that Apogee had actual knowledge of an unsafe condition on Truck #308, which was a violation of Apogee's own written safety business standard and which, if left unrepaired, would result in a serious injury to Bevins. In addition, Bevins disagrees with the district court's finding that with all of the above knowledge Apogee could refuse to fix the known unsafe condition and then knowingly place Bevins in the unsafe equipment and direct him to operate it. There is absolutely nothing in the district court's opinion explaining how or why this crucial evidence was ignored.

The district court likewise misplaces importance on the fact that while **30 C.F.R. § 56.14100** states that known defects have to be repaired it does not specifically identify "overextending cylinders and freefalling beds" as a defect. Clearly, such specificity is not required under **West Virginia Code § 23-4-2(d)(2)(ii)(C)** as was explained in *Ryan v. Clonch Industries, Inc.*, 219 W. Va. 664, 639 S.E.2d 756 (2006) when the trial court made the same mistake. In **Ryan**, the trial court was <u>reversed</u> for making the same error made by the district court in this case. In that case, Mr. Ryan was cutting metal banding when he was struck in the left eye by a sharp piece of the metal banding material. He was not wearing safety glasses. The employer, Clonch, pursuant to **29 C.F.R. § 1910.132(d)(1) (2006)**, was required to conduct a hazard assessment "to determine if hazards are present, or

40

are likely to be present, which necessitate the use of personal protective equipment (PPE)." The regulation further directed that "[i]f such hazards are present, the employer shall:  (i) Select, and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment." **29 C.F.R. § 1910.132(d)(1).** Clonch admitted it did not perform the required hazard assessment.   The *Ryan* trial court granted summary judgment, however, because the words "*Band Cutting*" did not appear in the regulation.

The West Virginia Supreme Court disagreed with the trial court's conclusion that Mr. Ryan failed to submit evidence that Clonch had violated a specific regulation because the regulation did not mention "*Band Cutting*".  Instead, the West Virginia Supreme Court held that   **W. Va. Code § 23-4-2(d)(2)(ii)(C)** expressly states that the type of statute, rule, regulation or standard, the violation of which is *adequate to establish this prong* of the five part test for this type of deliberate intent action, is a "statute, rule, regulation or standard [that is] specifically applicable to the particular work and working condition involved, *as contrasted with* a statute, rule, regulation or standard *generally requiring safe workplaces, equipment or working conditions.*" (*Emphasis added*)

The *Ryan* court went on to stated that "contrary to what the trial court order indicates, the OSHA regulation found at **29 C.F.R. § 1910.132(d)(1)** is not rendered a regulation '*generally requiring safe workplaces, equipment or working*

*conditions',* **merely because it does not expressly identify the <u>banding process</u>"**.
**W. Va. Code § 23-4-2(d)(2)(ii)(C)**. A regulation *"generally requiring safe*
*workplaces, equipment or working conditions,"* would merely require safety in a
broad sense, without imposing a specific affirmative duty upon an employer. By
contrast, **29 C.F.R. § 1910.132(d)(1)** does not merely require a safe workplace, or
safe equipment or working conditions. Instead, it imposes a specific mandatory
duty upon employers in the labor industry to assess their workplaces for the
purpose of identifying hazards, assessing the need for protective equipment, and,
where a need is identified, requiring employees to use the requisite safety
equipment. Because **29 C.F.R. § 1910.132(d)(1)** prescribes specifically identified
duties, as opposed to merely expressing a generalized goal of safety, we conclude
that it is not the type of regulation "generally requiring safe workplaces, equipment
or working conditions" that is rejected as a foundation for a deliberate intent action
under **W. Va. Code § 23-4-2(d)(2)(ii)(C).**

In the case at bar, the same can be said for **30 C.F.R. § 56.14100.** This federal
safety regulation does not state a simple goal to be safe. <u>Instead</u>, **30 C.F.R. §**
**56.14100** specifically identifies duties to be performed <u>once</u> a known defect is
discovered. It is not the type of regulation "generally requiring safe workplaces,
equipment or working conditions" that is rejected as a foundation for a deliberate
intent action under **W. Va. Code § 23-4-2(d)(2)(ii)(C).** Under **30 C.F.R. §**

42

**56.14100(b)** known defects <u>shall</u> be corrected in a timely manner to prevent the creation of a hazard to persons. Under **30 C.F.R. § 56.14100(c)** when defects make continued operation hazardous to persons, the defective items including <u>self-propelled mobile equipment</u> **shall** be taken out of service and placed in a designated area posted for that purpose, or a tag or other effective method of marking the defective items **shall** be used to prohibit further use until the defects are corrected.

Once Apogee has knowledge of the failed limit switch, overextending cylinders and the freefalling bed it <u>does not have the option</u>, under the federal safety standards or its <u>own written Mine Safety Program</u>, to place Truck #308 back in service without making repairs. Either of these standards is specifically applicable to Bevins' particular work and working condition. The duty is mandatory, clear, and cannot be ignored.

Similarly, in *McComas v. ACF Industries, LLC*, 750 S.E.2d 235 (WV 2013) the West Virginia Supreme Court confirmed that a safety standard that places a duty upon the employer is not a general safety standard. In *McComas*, the circuit court determined that a 480–volt, fused, switch box was subject to the mandatory inspection requirements of Standard 70B. The circuit court stated that ACF failed to comply with the requirements and that, if inspections had been conducted, ACF might have identified the problem with the box. The circuit court, nevertheless, concluded that Standard 70B was a general, electrical safety provision, rather than

43

a standard specifically applicable to McComas' particular work and working conditions. The West Virginia Supreme Court, however, held that the conclusion was undermined by the circuit court's further statement indicating that, if inspections required by Standard 70B had been conducted, ACF might have identified the specific problem, *i.e.,* worn out insulation within the 480–volt box resulting in the arc blast. Understandably, the West Virginia Supreme Court found no basis for the trial court granting ACF's motion for summary judgment under *Subpart (C)* of the deliberate exposure statute.

The same legal principal can be applied to ***Bevins***. Apogee is under a mandatory requirement to fix any known defect that can make the continued operation of mobile equipment hazardous to employees. While ACF was not told about nor did it discover a problem, Apogee had prior and specific knowledge of a mechanical problem and knew because of injury to prior employees the result would be devastating if the problem was not corrected. As was determined in <u>McComas</u>, if Apogee corrected the defects about which it had specific knowledge and repaired Truck #308, as required by **30 C.F.R. § 56.14100(c)** or the **Apogee Mine Safety Program** requisite, Bevins would not be disabled.

Finally, as previously noted, the district court relied heavily on *Greene v. Carolina Freight Carriers*, 663 F. Supp. 112, 115 (S. D. W. Va. 1987) (J. Haden). The *Greene* case, however, is not remotely similar to Bevins. In *Greene*, the statute

44

in question was titled "*general*" as opposed to the mandatory safety standards that apply here. In ***Greene***, the employer <u>did not know</u> that the step was broken on the day Mr. Greene was injured. Although the step broke in the past, it had been repaired and as far as the employer knew was repaired on the day Green was injured. In ***Greene***, the plaintiffs claimed the employer had a duty to check the step each day as well as other components to see if it was in good working order. The district court found that such a requirement was simply "too general" in nature. Judge Haden in *Greene* was correct.

Here, however, Bevins does not claim nor has he ever claimed that Apogee had a duty to check Truck #308 every day and find all defects or unsafe conditions. The evidence in this case is that <u>the very day</u> Bevins drove Truck #308, Apogee had actual knowledge that the truck was in an unsafe condition and knew the hazards associated with operating the Truck in that the unsafe condition. Once Apogee has knowledge of the unsafe condition, a mandatory federal safety standard and Apogee's own business standard requires inspection and repair before operation. Undoubtedly, in ***Greene***, if the employer had actual knowledge that the truck step was once again broken, prior to and on the day Greene used it, then Judge Haden would have had a different case to decide and his opinion would be 100% different.

## CONCLUSION

It is clear that the district court denied Kenneth and Victoria Bevins crucial discovery found warranted by Magistrate Judge Tinsley, repeatedly ignored evidence in the record, drew inferences contrary to other evidence that was in the record and then misapplied the summary judgment standard. The evidence in the record, taken in the light most favorable to Kenneth and Victoria Bevins, demonstrates just the opposite of what the district court found.  For summary judgment purposes, Mr. and Mrs. Bevins have satisfied their burden and reasonable jury could conclude that Bevins made out a prima facie case of the requisite elements found in *Subpart (C)* of the deliberate exposure statute.

The district court was required to view all the facts and all justifiable inferences arising therefrom in the light most favorable to Kenneth Bevins, as the nonmoving party and was required to scrupulously follow the standards for summary judgment. Clearly, summary judgment was not warranted in this case.

The Appellants, Kenneth and Victoria Bevins respectfully request this Court vacate and remand the Memorandum Opinion and Judgment Order and for such and other relief that this Court may deem just and proper.

## <u>REQUEST FOR ARGUMENT</u>

Appellants, Kenneth and Victoria Bevins request oral argument.

Respectfully submitted

/s/ Cynthia M. Ranson

**Cynthia M. Ranson, WVSB #4983**
**J. Michael Ranson, WVSB #3017**
Ranson Law Offices, PLLC
1562 Kanawha Blvd., East
Post Office Box 3589
Charleston, West Virginia 25336
(304) 345-1990

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    32(a)(7)(B) because:

    this brief contains 11,243 words, excluding the parts of the brief
    exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using
    Microsoft Word in 14 point Times New Roman.


Dated:  March 25, 2015          /s/ Cynthia M. Ranson
                                Cynthia M. Ranson

                                *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 25, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Eric T. Frye
William J. Hanna
Keith R. Hoover
FLAHERTY, SENSABAUGH
  & BONASSO, PLLC
200 Capitol Street
P. O. Box 3843
Charleston, WV  25338
(304) 347-4262

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219